# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### March 8, 2011 Session

## STATE OF TENNESSEE v. TAMMY THOMPSON

Appeal from the Circuit Court for Maury County
No. 17,927    Stella L. Hargrove, Judge

---

### No. M2009-01714-CCA-R3-CD - Filed October 19, 2011

---

The Defendant, Tammy Thompson, was found guilty by a Maury County Circuit Court jury of assault, a Class A misdemeanor, and resisting arrest, a Class B misdemeanor. See T.C.A. §§ 39-13-101 (assault) (Supp. 2008) (amended 2009, 2010), 39-16-602 (resisting arrest) (2010). She was sentenced to eleven months and twenty-nine days, with sixty days to be served, for assault, and to six months on probation for resisting arrest. The sentences were imposed concurrently. On appeal, she contends that (1) the prosecution was barred by the statute of limitations, (2) the evidence was insufficient to support the resisting arrest conviction, (3) the trial court erred in admitting evidence of the Defendant's conduct after she was taken to the jail, and (4) the trial court erred in failing to give a self-defense jury instruction. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, JR., and NORMA MCGEE OGLE, JJ., joined.

Sam Patterson, Columbia, Tennessee (at trial) and John E. Herbison, Nashville, Tennessee (on appeal), for the appellant, Tammy Thompson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Mike Bottoms, District Attorney General; and Larry Nickell, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

At the trial, Maury County Sheriff's Deputy Robert Wagonshultz testified that on April 20, 2006, he heard the dispatcher report a 9-1-1 call about a disturbance on Roy Dodson Road. He said that shortly thereafter, Sergeant Mike Diaz directed Deputy Sam Barnes and him to go to Roy Dodson Road to arrest Donnie Thompson. He said Sergeant Diaz stated that he had an arrest warrant in his hand for Mr. Thompson. He said he did not know at this point who obtained the warrant.

Deputy Wagonshultz testified that at about 7:08 p.m., he arrived at the address where they were told to go. He said that as he sat in his car, he saw the Defendant walk toward him. He said that she inquired whether he had business there and that he told her he had an arrest warrant for her husband. He denied that he mentioned a search warrant. He said that the Defendant stated that he had to have an arrest warrant and that he responded that an arrest warrant was not required but that he would give her a copy of the warrant if she would go to the sheriff's department. He said the Defendant claimed to be a lawyer, said she knew the law, and told him to leave her property. He said the Defendant stated that her husband was home. He described the Defendant as "very uncooperative" and "very irrational." He said that despite his attempts to explain that he did not need a warrant, the Defendant continued to insist otherwise. He said, "[The Defendant] was standing kind of between me and the house kind of offset a little bit."

Deputy Wagonshultz testified that he realized the Defendant was not going to cooperate and that he decided to knock on the door and arrest Mr. Thompson. He said that as he walked toward the house, the Defendant kept stepping in front of him and told him to leave. He said that he tried to go around the Defendant and that she continued to scream at him. He said he told her that she could be arrested, as well. He said that he knew there was an assault suspect somewhere on the premises from the earlier incident and that the Defendant's behavior was threatening. He said he grabbed the Defendant's right arm and advised her that she was under arrest for resisting the arrest of Mr. Thompson. He said the Defendant pulled away and was "screaming bloody murder" but not screaming words. He said that he put the Defendant's arm behind her back and that she tried to straighten it and reached back with her leg. He said he thought the Defendant was going to kick him. He said he brought the Defendant to the ground and held her arm behind her back, as he was trained to do. He said that as he tried to move the Defendant's left arm from underneath her body, she kicked the side of his legs several times with her right leg. He said he eventually gained control of the Defendant's left arm and handcuffed her. He said the Defendant's seventeen-year-old son was in the yard yelling at him during the entire altercation.

Deputy Wagonshultz testified that Deputy Barnes arrived around the time he handcuffed the Defendant. He said that he explained the situation to Deputy Barnes and that the Defendant confirmed that her husband was inside the house. He said that when he and Deputy Barnes went to the house, the Defendant was handcuffed in the yard and the Defendant's son was walking around the yard. He said that after they knocked, Mr. Thompson answered the door. He said that Mr. Thompson insisted that the officers had to have an arrest warrant but that he eventually agreed to go with them. He said they did not search the house. He said that he took the Defendant to the jail and that Deputy Barnes took Mr. Thompson.

Deputy Wagonshultz testified that the Defendant asked for an ambulance because she was car sick and allergic to grass but denied that she complained of any other medical issues. He said that she made a sound as if she were spitting on the back of the seat and that when they arrived at the police station, there appeared to be saliva on the back of the seat. He said she continued her "irrational" behavior at the jail. He said she yelled at the magistrate and Sergeant Diaz. He said the magistrate told her twice that she would be held in contempt if she did not calm down. He said that while he was completing paperwork and the Defendant and Mr. Thompson were in cells where they could see each other, they were laughing and saying they knew who he was and where he lived. He said Mr. Thompson told them that due to the nature of the allegations, they were not welcome at the Thompson house.

On cross-examination, Deputy Wagonshultz agreed that a sheriff's department document stated that at 6:55 p.m., a caller reported that neighbors threatened her at the end of her driveway. He said the caller's name was listed at the 9-1-1 center. He agreed that the document listed him as being en route to the location at 6:57 p.m. and that it showed that both he and Deputy Barnes arrived around 7:00 p.m.

Deputy Wagonshultz testified that he knew Michael and Diane Duvall, who lived on Tom Fitzgerald Road. He said that he was twenty-nine years old and that he went to high school with Mr. Duvall. He said that before coming to the sheriff's department, he also worked with Mr. Duvall for a couple of months. He said he remembered a trial regarding the Defendant's claim that a member of the Duvall family shot her dog and admitted that he was a courtroom observer. He said Mr. Duvall sought his advice about problems with a neighbor, although he claimed not to have known at the time that the Defendant and her family were the neighbors. He said he spoke with Mr. Thompson about the matter once or twice about a year before the events in the present case.

Deputy Wagonshultz acknowledged that the Defendant never advanced on him but said she changed her position. He admitted that Mr. Thompson was not outside during the altercation and that he did not know at the time whether Mr. Thompson was going to come

outside. He said the Defendant stated several times she was a lawyer and denied that she said she was an auditor. He did not recall whether the Defendant asked to speak with a lawyer while they were in her front yard.

Deputy Wagonshultz testified that he thought the Defendant's house was the only one on the road. He denied that he went to the Duvall home before going to the Defendant's house. He remembered a car arrived and the people inside asked what was happening, but he said he and Deputy Barnes instructed the people to leave. He doubted that he would recognize the people who were in the car. He said he thought the Defendant was under arrest by the time the car arrived.

Deputy Wagonshultz testified that the criminal charges about shooting a dog involved Mr. Duvall's father-in-law. He said the charges against the Defendant's husband that were the subject of the arrest warrant he went to execute at the Thompson home on April 20, 2006, were dismissed at Mr. Duvall's request.

Deputy Wagonshultz testified that with regard to the struggle during the arrest, he grabbed the Defendant's right arm, which was at her side. He said that when he advised her that she was under arrest, she made a movement with her hand and yelled. He said he grabbed her wrist and positioned it behind her back in handcuffs. He acknowledged that the Defendant ended up on the ground. He said he was "beside her and above her" but denied that he was on top of her. He said he was 5'11" and weighed about 165 pounds at the time and agreed that the Defendant was a small woman. He said that she kicked him on the side of his knee with her heel and that he did not seek medical treatment or notice any significant injury. He said he arrested her for preventing her husband's arrest. He said that after the Defendant was arrested, Mr. Thompson came to the door and said he had been in the shower. He said that they allowed Mr. Thompson to dress and that Deputy Barnes took Mr. Thompson to the jail.

Deputy Wagonshultz testified that the distance between the Defendant's house and the jail was seven or eight miles and acknowledged that one of the roads was curvy. He did not recall driving above the speed limit on the way to the jail. He acknowledged that the Defendant complained that she suffered from carsickness and had allergies. He said he heard a sound that he thought was spitting, not vomiting. He said Magistrates David Potts and John McGlasson were present when they took the Defendant to the magistrate's office. He said the magistrates were changing shifts when they arrived.

Deputy Wagonshultz acknowledged that the Defendant filed a lawsuit in which he and the sheriff's department were defendants. He agreed the lawsuit was still pending.

Deputy Wagonshultz acknowledged that he had video recording equipment in his car. He said he did not record anything that occurred at the scene or on the way to the jail.

On redirect examination, Deputy Wagonshultz said Mr. Duvall did not want to prosecute Mr. Thompson after the case reached the grand jury because the Duvalls moved away from the Defendant's home. He said the earlier case involved a warrant the Defendant obtained against Mr. Duvall's wife and father-in-law. He acknowledged that the earlier case was dismissed.

Deputy Wagonshultz testified that the document used by the magistrates to record complaints reflected 6:40 p.m., which he said was about fifteen minutes before he was called to the scene. He said the allegation was that Mr. Thompson committed simple assault. He denied that Mr. Duvall called him, said that Mr. Duvall was going to obtain the warrant, and denied that he was present when it was taken.

On recross-examination, Deputy Wagonshultz identified the dispatch log, which was received as an exhibit. He agreed the dispatch log noted that at 6:55 p.m., a caller complained that her neighbor was at the end of her driveway threatening and harrassing her. He agreed that the magistrate's log noted at 5:54 p.m. that Mr. Duvall called and reported he had a video of the Defendant and Mr. Thompson threatening to kill Mr. Duvall. He said he could not explain why there was a discrepancy in the times on the two documents unless there were two calls. He said he was not involved and could not verify the information in the documents.

On further redirect examination, Deputy Wagonshultz testified that he first learned about the arrest warrant for Mr. Thompson when he was dispatched to respond to the 6:55 p.m. call about a disturbance at the end of a driveway. On further recross-examination, he identified the dispatch time as 6:57 p.m.

Maury County Sheriff's Department Supervising Sergeant Mike Diaz testified that on April 20, 2006, at about 7:00 p.m., he sent Deputy Wagonshultz and Deputy Barnes to the location of a dispute between neighbors. He said he chose to send Deputy Wagonshultz because the deputy was working in the zone of the address and denied there was any other reason. He said that to the best of his memory, they received two calls about the same people that evening. He said he saw Mr. Duvall taking out a warrant at the magistrate's office around 6:00 p.m. or a little later. He said Magistrate Potts wrote the information on the warrant. Sergeant Diaz said that Deputy Wagonshultz was already on his way to respond to the complaint when Sergeant Diaz advised him that there was an arrest warrant. He denied seeing Mr. Duvall talking to Deputy Wagonshultz at the sheriff's department.

On cross-examination, Sergeant Diaz testified that he arrived around 6:00 p.m. for his shift that began at 6:45 p.m. He did not recall exactly when he saw Mr. Duvall in the magistrate's office but estimated it was around 7:00 p.m. He said he dispatched officers after receiving the second complaint around 7:00 p.m. He said there was no record created when he dispatched officers to a scene using his radio. He thought that Mr. Duvall made the first 9-1-1 call and that Ms. Duvall made the second call while Mr. Duvall was obtaining the warrant. He acknowledged that he did not speak with Ms. Duvall.

Maury County Sheriff's Deputy Sam Barnes testified that he was patrolling on April 20, 2006, when he and Deputy Wagonshultz responded to a call involving the Defendant. He said he arrived as Deputy Wagonshultz handcuffed the Defendant. He said that Deputy Wagonshultz approached him and that the Defendant remained handcuffed on the ground. He described the Defendant as very belligerent and said she was yelling and screaming. He said that the Defendant's son was behind Deputy Wagonshultz yelling and screaming as the Defendant was being handcuffed and that he told the Defendant's son to back away. He said he tried to calm the Defendant and her son, but the Defendant was "extremely uncooperative." He said the Defendant complained that Deputy Wagonshultz had not shown her a warrant.

Deputy Barnes testified that he took Mr. Thompson to the sheriff's department and that Deputy Wagonshultz transported the Defendant. He said he did not see Deputy Wagonshultz walk the Defendant to the patrol car because he was inside the house with Mr. Thompson, who was getting dressed. He did not recall seeing the Defendant try to kick Deputy Wagonshultz.

Deputy Barnes testified that he did not recall the Defendant complaining of any injuries after they arrived at the jail. He did not recall her requesting an ambulance, either at the scene or at the jail or hear her asking for a gurney or wheelchair. He remembered her claiming to be a lawyer and telling everyone they would lose their jobs. He could not recall whether she threatened litigation.

On cross-examination, Deputy Barnes testified that an officer could not forcibly enter a home to arrest a person with a misdemeanor warrant. He did not recall whether Mr. Thompson was charged with a misdemeanor or a felony. He said his understanding from Deputy Wagonshultz was that the Defendant refused to allow Deputy Wagonshultz inside the home, refused to step away after being warned to do so, and cursed Deputy Wagonshultz. He thought a juvenile petition could have been obtained against the Defendant's son based upon the son's actions but acknowledged that her son was not charged.

Michael Duvall testified that he was a resident of Alabama at the time of the trial but that he lived in Maury County on April 20, 2006, when he obtained a warrant against Donnie Thompson for threatening his life. He said he and Mr. Thompson had been involved in prior litigation. He said that he contacted Magistrate Potts and that the magistrate and an officer completed the warrant. He acknowledged that he and Deputy Wagonshultz were friends from school and shared an interest in old cars. He said he did not call Deputy Wagonshultz before he went to obtain the warrant. He said he called Magistrate Potts, advised that he had a video recording of the threat, and obtained the warrant. He said he went home after obtaining the warrant, and he denied talking to Deputy Wagonshultz that day. He acknowledged that he dropped the prosecution of the warrant, explaining that the Defendant and her husband had an issue with his wife and father-in-law but that he tired of coming to court and dealing with the matter. He denied that Deputy Wagonshultz tried to convince him to continue pursuing the warrant. He admitted talking to Deputy Wagonshultz and asking for advice related to law enforcement but denied he talked to him about the warrant.

On cross-examination, Mr. Duvall identified a person in the courtroom as his father-in-law, Robert Wheeler. He said that there had been a jury trial about the prior matter and that Deputy Wagonshultz was present on one day of the trial.

Mr. Duvall testified that he worked until 6:00 p.m. on the day of the incident that led to the warrant in this case. He said the incident took place about 6:40 or 6:45 p.m., after he arrived at home about 6:30 p.m. He said he was unsure about the times. He said his wife called about 6:55 p.m. to report the harassing neighbors at the end of the driveway.

Mr. Duvall testified that he and Deputy Wagonshultz had known each other since seventh or eighth grade. He said they were "pretty good friends" in high school. He said that Deputy Wagonshultz was away in the military for a time after graduation but that they occasionally saw each other or talked on the telephone. He admitted Deputy Wagonshultz had been a guest in his home when he lived on Tom Fitzgerald Road. When asked why he dismissed the charges against the Defendant's husband, Mr. Duvall said, "[Because] I'm tired of messing with him."

Mr. Duvall testified that he spent about twenty or thirty minutes at the sheriff's department obtaining the warrant. He identified the officer who filled out the warrant as Shane Hunter, whose younger brother had been Mr. Duvall's classmate. He said he spoke with Deputy Hunter after Magistrate Potts reviewed the video recording. He said the magistrate requested that Deputy Hunter take his statement. He said Deputy Hunter "called in the warrant." Mr. Duvall could not recall the time when he arrived home. He said the police would not have to come to his home on Tom Fitzgerald Road in order to get to the Thompson home on Roy Dotson Road. He said he had "not really" talked to Deputy

Wagonshultz about the present case, other than mentioning that he had been subpoenaed or that the case had been continued.

Mr. Duvall testified that he did not witness the incident involving the Defendant. He said he did not really know the Thompsons and had never stopped and spoken to them. He said that when he arrived home from work on April 20, 2006, the Defendant was parked across his driveway, blocking the entrance. He said that she left at some point but that Mr. Thompson arrived about five minutes later and spun his tires in front of the Duvall house. He said his wife made a video recording of the incident because they were told after making complaints about prior incidents to the sheriff's department that they needed proof.

On redirect examination, Mr. Duvall identified his signature on the warrant. He read from the warrant, which stated that Mr. Thompson threatened to assault and kill him and that he was in imminent fear for his safety. He identified Magistrate Potts's signature and denied that Deputy Wagonshultz signed the warrant, which was received as an exhibit. He said he was tired of missing work to pursue the warrant and was concerned about his employer's tolerance for continued absences.

Robin Walkers testified that she was a correctional officer for the Maury County Sheriff's Department. She said she booked the Defendant into the jail on April 20, 2006. She recalled that the Defendant was loud and belligerent while in a holding cell. She said that the Defendant's husband was in another holding cell and that he and the Defendant talked with each other. She said Mr. Thompson tried to calm the Defendant and told her they would address her complaints later. She said the Defendant complained of arm pain. She said that the Defendant was belligerent when she was being moved during the booking process and that the Defendant hit a door, said she was going to sue everyone, and complained. She said that the Defendant was eventually released on bond and that the Defendant later returned with a bondsman for her husband's release.

On cross-examination, Officer Walkers testified that the Defendant complained about injuries to her arm. She acknowledged that the "vast majority" of arrestees complain. She agreed she would be upset if she were arrested wrongfully but said she did not know what happened between Deputy Wagonshultz and the Defendant.

Maury County Magistrate John McGlasson testified that he encountered the Defendant at the jail on April 20, 2006. He said he arrived to relieve Magistrate Potts, who was talking to the Defendant. He said he tried to calm the Defendant after Magistrate Potts left. He said he advised her that she was in a courtroom and could be held in contempt if she were not quiet. He said the Defendant complied. He said she was "very belligerent" and not in control of herself. Magistrate McGlasson said he was an employee of the general sessions

-8-

court, not the sheriff's department. He said that he did not see anyone mistreat the Defendant and that the officers and officials were professional.

On cross-examination, Magistrate McGlasson testified that he did not recall the time he arrived that evening. He said his schedule varied. He identified Magistrate Potts's handwriting on a log sheet used by the magistrates and his own handwriting on the second page. He stated that he recorded the time regarding the Defendant as "8:06." He said that arrestees were typically brought before a magistrate when they first arrived at the sheriff's department. He said he talked with the Defendant for approximately ten minutes. He did not recall why he, not Magistrate Potts, issued the warrant against the Defendant, although he recalled Magistrate Potts's having to use the restroom. He said he never spoke with Mr. Duvall and was not present when Mr. Duvall took out the warrant against Mr. Thompson.

On redirect examination, Magistrate McGlasson acknowledged that Magistrate Potts issued the warrant against Mr. Thompson. He said he did not see Deputy Wagonshultz at the jail. On recross examination, he acknowledged that Deputy Wagonshultz might have been at the jail but said he did not recall talking to him "at any length." He said he spoke with Deputy Wagonshultz "only enough to understand what I was signing, as the warrant goes. Just the probable cause presented." He said he did not receive information about the history of the matter from Deputy Wagonshultz. On further redirect examination, he testified that no one told him to be sure to issue a warrant against Mr. Thompson and see that Mr. Thompson went to jail.

The court received as an exhibit a certified copy of a complaint filed in federal court by the Defendant, Mr. Thompson, and their son against Deputy Wagonshultz, the sheriff, employees of Maury County, and the county. The State rested.

The Defendant's son, Donnie Thompson, Jr., testified that he was seventeen years old on April 20, 2006. He said that when Deputy Wagonshultz arrived at his home, he went outside and asked the deputy what right he had to be on the property and if he had a warrant. He said Deputy Wagonshultz responded that he did not have or need a warrant and asked for Donnie Thompson. He said that he identified himself as being Donnie Thompson and that Deputy Wagonshultz said he was there to arrest Donnie Thompson but refused to state the charges. He said that the deputy walked toward the house and that he walked backwards in order to talk to the deputy. He said he asked if Deputy Wagonshultz had a warrant to go inside the house, that the deputy said he did not, and that he told the deputy not to enter unless he had a warrant. He said that the deputy stepped around him to his right and that he caught up and stood in front of the deputy again. He said that the Defendant stood behind him at the stairway to the house during this exchange and that he was closer to the deputy

than his mother. He identified their respective locations in a photograph that was received as an exhibit.

Donnie Thompson, Jr., testified that Deputy Wagonshultz threatened to arrest him for disturbing the peace or interfering with an arrest but did not do so. He said the Defendant spoke up at this point and told the deputy that Donnie Thompson, Jr., was not eighteen and that the deputy was not to touch the boy. He said Deputy Wagonshultz "got about three inches out of her face, and told her that it was none of her concern; that to just basically shut up and to stay out of it." He said the Defendant objected on the basis that she had the right to tell Deputy Wagonshultz to leave him alone. He said that his mother and the deputy argued and that as he tried to step onto the porch, the deputy told him he could not go inside the house. He said he wanted to go inside to call Enoch George at the sheriff's department because Deputy Wagonshultz was "in [his] mother's face." He said that the Defendant tried to step between Deputy Wagonshultz and the house but that the deputy said she was not going inside and "threw her into the yard." He said that he did not know whether the deputy grabbed the Defendant by the arm but that she landed face down in the yard. He said the deputy kneeled on her back and handcuffed her. He said that after the deputy handcuffed the Defendant's right arm, the Defendant tried to comply with the deputy's demand to surrender her left arm but that she could not get it out from under herself because the deputy was kneeling on her back. He said the deputy grabbed the Defendant's wrist, pulled her arm behind her back, and wrestled with her. He said that due to the deputy's restraint of the Defendant, she was unable to strike the officer. He said that Deputy Barnes and "Norma and Ken" arrived during the altercation.

Donnie Thompson, Jr., testified that after Deputy Wagonshultz restrained his mother on the ground, the deputy walked toward Deputy Barnes and he went to call for help. He said he stood between the deputies when they went to the door and knocked. He said his father answered the door wearing jeans or shorts, having just finished bathing. He said his father asked the officers if they had a warrant and why they were there. He said the officers stated they were going inside. He said his father asked to be allowed to dress, and the officers stated they would have to come inside with his father. He said Deputy Barnes went inside with his father and later brought his father outside and handcuffed him. He said that the Defendant was still on the ground and that his father told the officers to help the Defendant get up because she was allergic to grass. He said Deputy Wagonshultz roughly helped the Defendant to stand. He said that his father was taken away in a patrol car and that his mother walked toward the road to talk to "Norma and Ken" to ask them to call for help. He said he had been unable to summon help because the telephone did not work outside. He said that he never heard the Defendant claim to be a lawyer and that she was an accountant who worked for the State.

On cross-examination, Donnie Thompson, Jr., agreed that the incident did not need to happen. He said he had the right to question a person who tried to enter his home. He said that neither he nor his mother ever stopped Deputy Wagonshultz from doing his job and that his mother never stood in Deputy Wagonshultz's way. He claimed the only time the Defendant became vocal was when Deputy Wagonshultz was aggressive and threatened to arrest him.

Donnie Thompson, Sr., the Defendant's husband, testified that he lived on Roy Dodson Road. He said that on April 20, 2006, he was working outside when the Defendant came home in hysterics. He said the Defendant told him that she had been stopped by neighbors with whom there had been problems. He said he drove to the neighbors' house and told them to leave his wife and child alone, returned home, finished working on fences, and went inside. He said that he smoked a cigarette and took a bath and that after he had been in the bathtub a couple of minutes, he heard banging on the door. He said he answered the door and saw two police officers. He saw his wife face down on the yard. He said that one of the officers, who he thought was Deputy Barnes, said they were there to arrest him. He said he asked to see a warrant and the officer said he did not have one. He said that he asked the officer to "tell [him] what this is about" and that despite the officer's uniform, he did not know whether the person was a deputy. He said the officer stated only that there was a warrant at the jail and never answered his inquiries about the nature of the charges. He said he advised the officer that he did not want to go anywhere without a warrant and the officer responded, "I could just slam you down." He said he was wearing only a pair of jeans and asked the officer to allow him to finish dressing. He said that the officer followed him into the house and that he told the officer he did not want the officer in his house. He said the officer insisted that he could enter the home only if the officer were allowed inside. He said that he again objected but that both officers followed him inside. He said that while they were inside the house, he told Deputy Barnes to tell Deputy Wagonshultz to get the Defendant off the ground because the Defendant had allergies. He said Deputy Wagonshultz left the house.

Donnie Thompson, Sr., testified that when Deputy Barnes escorted him outside, the Defendant was off the ground. He said Deputy Barnes handcuffed him and placed him in a patrol car. He said that he heard the Defendant ask for medical treatment, that his son inquired whether he should call 9-1-1, and that Deputy Wagonshultz said not to worry because there would be an ambulance waiting for the Defendant at the jail. He said Deputy Barnes began driving and stated that he was going to take Donnie Thompson, Sr., to the Duvall home. Mr. Thompson said he objected and told the deputy that if he was under arrest, the deputy should take him to jail. He said Deputy Barnes took him to jail and did not say anything else about going to the Duvall home. He said the deputy drove fast and ran off the

road and he inquired whether they were going to make it to town.  He identified Ken and Norma Fargason as neighbors and said they arrived during the events at his house.

Donnie Thompson, Sr., acknowledged that he and his wife filed a civil rights lawsuit against the county.  He said his attorney selected two-and-one-half million dollars as the amount of damages sought.  He said his criminal charges were dismissed "at the grand jury."  He denied hearing his wife say that she was an attorney.

On cross-examination, Donnie Thompson, Sr., acknowledged that Deputy Wagonshultz did not mistreat him.  He agreed his son was not arrested.  He said Deputy Barnes's driving made him uncomfortable when the deputy ran off the road.  He said that although neither officer pulled their guns, they had their hands on them.  He said that he did not give Deputy Barnes any trouble or fight with him but that he asked for an arrest warrant.  He said there was no arrest warrant at the time the officers were on his property because the magistrate signed the arrest warrant in front of him.  He said Deputy Barnes did not "slam [him] down" but said the deputy told him "y'all have been watching too much tv."

Ken Fargason testified that he lived on Tom Fitzgerald Road and had known the Defendant and her family for about eighteen years.  He said that on April 20, 2006, he was in his house and saw sheriff's deputies on his road.  He was concerned for the welfare of his neighbors, and he and his wife drove to the Thompson home.  He said that when they arrived, he saw an officer bringing the Defendant out the door and down the steps.  He said the Defendant came toward them and asked him to call her lawyer.  He said that the officer walked the Defendant to a patrol car, that the officer held his hand to keep the Defendant from bumping her head when entering the car, and that the officer shoved her inside.  He said he never heard the Defendant claim to be a lawyer.  He denied that the Defendant was "acting out of control."

On cross-examination, Mr. Fargason acknowledged that the officer did not prevent the Defendant from asking him to call her lawyer.  He said he did not call the Defendant's lawyer.  He said that after the Defendant spoke to him, the officer guided the Defendant toward the patrol car.  He denied seeing the Defendant on the ground with an officer crouching beside her.

Norma Fargason testified that she lived on Tom Fitzgerald Road.  She said that on April 20, 2006, she arrived at the Defendant's house as an officer was taking the handcuffed Defendant to a car.  She said that the Defendant tried "to slow down a little bit" on the way to the car in order to ask the Fargasons to call her lawyer and that the Defendant named the lawyer.  She said that she thought the officers were rough with the Defendant and that an officer shoved the Defendant into the car.  She said that the Defendant was upset but that she

did not see the Defendant try to harm or struggle with the officers. She said that she and her husband stayed after the officers left to see if the Defendant's son needed assistance.

On cross-examination, Ms. Fargason acknowledged the officers did not try to prevent the Defendant from requesting that her lawyer be notified. She said she did not see the Defendant on the ground and Deputy Wagonshultz kneeling beside her or on top of her. She said she and her husband were not present at that time.

The Defendant testified that she lived on Roy Dodson Road and was employed by the State Comptroller as a Medicaid teacher auditor. She said that on April 20, 2006, she arrived home around 6:30 p.m. but that she was stopped on her way there because Michael and Dot Duvall blocked the intersection of Tom Fitzgerald Road and Roy Dotson Road with Mr. Duvall's car. She said Ms. Duvall pulled her van out of the Duvall driveway and blocked her from behind, blocking her in place. She said that the Duvalls threatened her and that Ms. Duvall filmed with a video recorder. She said Ms. Duvall stated she did not shoot the Defendant's dog and called the Defendant a liar. The Defendant explained that she had filed a lawsuit against the Duvalls for killing her dog. She said she was able to leave when Mr. Duvall moved his car. She said she went home and reported these events to her husband, who went to the Duvall home.

The Defendant testified that when Deputy Wagonshultz arrived, her husband was in the shower. She said she and her son went outside, with her son in front. She said that she asked Deputy Wagonshultz if he had business at her home and that he said he was there to arrest Donnie Thompson. She said that she advised him she needed to see the arrest warrant but that he said he did not have or need one. She said that her son identified himself as Donnie Thompson but that the officer knew he was not looking for her son and walked past them up the steps to the house. She said her son yelled for him not to go inside the house without a warrant. The Defendant denied that she physically prevented Deputy Wagonshultz from entering her house. She said Deputy Wagonshultz came off the steps, pulled her son's arm, and struck him with handcuffs. She claimed that she told the deputy to leave her property and that he grabbed her right arm and put her on the ground. She said that the deputy was on top of her, that her arms were pinned underneath her body, and that he beat her with his fists. She said that she screamed for her husband to help and that Deputy Wagonshultz told her he was going to hit her every time she screamed. She denied that she tried to kick the deputy. She said she was not able to get her arm out from underneath herself because the deputy had her pinned to the ground. She said that Deputy Wagonshultz tried to pull off her shorts and that she told her son to call Enoch George. She said the deputy put his hand on his revolver and threatened to shoot her son if he made the call. She said the deputy threatened to kill her son three times. She said that after the deputy stood up, he stated that he beat her because she was "not a nice person." She said Deputy Wagonshultz

-13-

called for backup and claimed an officer was being attacked. She said Deputy Barnes arrived a short time later.

The Defendant testified that after she was handcuffed on the ground, the deputies went inside to arrest her husband. She said that her son came to her while she was on the ground and that Deputy Wagonshultz told her son he would be shot if he tried to help her stand up. She said the deputy unstrapped his holster. She said Deputy Wagonshultz dragged her to a police car. She said she told Norma and Kenny Fargason to call a lawyer, Bill Barnes.

The Defendant testified that she was hurt and in severe pain. She said she asked for medical attention. She said Magistrate Potts and Ms. Walters denied her medical treatment at the jail. She stated that Magistrate Potts told her she would be held in contempt of court if she continued to ask for medical treatment and that she went to the emergency room as soon as she was released from jail on April 21, 2006. She said she was bruised from her shoulders down her body, in her rib area, and on the back of her leg. From photograph exhibits, she identified bruises she attributed to the incident. She said that she saw a doctor "several" times afterwards and that she attended physical therapy for six weeks as a result of her injuries. She said she had a CAT scan months later because she was having sinus trouble and difficulty breathing. She said she weighed 100 pounds on the day of the incident. She said that she previously had the Duvalls arrested and that about three months after the arrests, in approximately July 2005, Deputy Wagonshultz followed her home from work and that they "had words."

The Defendant testified that she identified herself as an auditor for the State. She said she did not think she resisted arrest or prevented Deputy Wagonshultz from serving an arrest warrant on her husband. She said she told the deputy he could not go in the house without a search warrant and asked to see an arrest warrant. She said that she called Enoch George's cellular telephone and told him she was assaulted by an officer and that they "played phone tag" for a few days before they spoke.

On cross-examination, the Defendant said that when Deputy Wagonshultz first arrived, she asked whether he had an arrest warrant. She said she told him she would go to the jail to see whether there was an arrest warrant and that when she did so, he said there was not one. She said she later told Deputy Wagonshultz not to enter her home without a search warrant. She acknowledged the civil complaint filed on her behalf by an attorney. She said that after she was followed in July 2005, she had a sheriff's department officer "run the tag" and learned that the car was registered to Rob and Jill Wagonshultz. She denied telling Phillip Bunting that Deputy Wagonshultz set her house on fire or that she told Jerry Williams that the deputy vandalized her mailbox. She admitted that her mailbox was vandalized and

said seven fires were set around her home. She did not know who was responsible for these acts.

The Defendant testified that she went to the District Attorney General's office, Magistrate Potts, and Judge Sands about Deputy Wagonshultz but was told she could not have an arrest warrant for an officer. She said she also requested a protective order because Deputy Wagonshultz said he would beat her again if she sought medical attention. She later said that Deputy Wagonshultz told her that if she sought medical treatment, "I will come to your house and get you again," but that she did not know what he meant. She said Deputy Wagonshultz claimed to be a "stud" and stated that everyone would believe him because he was an officer.

The Defendant testified that she studied law for forty hours per year as a State employee. She said that she was a certified fraud examiner, that she audited nursing homes, and that her job was to protect citizens from government entities.

After receiving the proof, the jury found the Defendant guilty of resisting arrest and assault. The trial court imposed concurrent sentences of eleven months and twenty-nine days for assault and six months for resisting arrest, with sixty days to be served in jail.

**I**

The Defendant contends that the prosecution was not commenced within the one-year statute of limitations. The State contends that the Defendant waived the statute of limitations issue by failing to raise it before the trial and that in any event, the Defendant appeared before a general sessions magistrate for a probable cause hearing within the limitations period. We agree with the State that the Defendant is not entitled to relief.

Before considering either the State's waiver argument or the merits of the Defendant's issue, we begin with a review of the pertinent information from the record. The proof reflects that the Defendant was taken before a magistrate for charges of resisting arrest and assault on an officer on the day of the alleged crimes, April 20, 2006. The certificate of the appellate record signed by the trial court clerk states:

> The arrest warrants in this case are not part of the technical record due to the fact that they were No Billed by the Maury County Grand Jury on 8-11-06, the Defendant was then indicted by a new Grand Jury under docket number 16830 which was then dismissed on 6-17-08, due to a superseding indictment being filed on 5-21-08. All of the foregoing is referenced in a

> Motion in Limine filed 6-2-08, Order to Amend Indictment and Dismiss Indictment filed on 6-17-08, Motion to Amend Clerical Mistake filed 8-28-09 and Agreed Order filed 10-16-09 which I have attached in my effort to comply with the [Court of Criminal Appeals'] Order to supplement the technical record .
> . . .

The record contains a copy of the Defendant's civil rights lawsuit filed in federal court in 2007, in which she alleged that "the charges against her were dismissed." According to the trial testimony, Mr. Duvall declined to prosecute when the matter reached the grand jury.

With respect to the commencement of the statute of limitations for a criminal prosecution, the relevant statute provides:

> A prosecution is commenced, within the meaning of this chapter, by finding an indictment or presentment, the issuing of a warrant, the issuing of a juvenile petition alleging a delinquent act, binding over the offender, by the filing of an information as provided for in chapter 3 of this title, or by making an appearance in person or through counsel in general sessions or any municipal court for the purpose of continuing the matter or any other appearance in either court for any purpose involving the offense.

T.C.A. § 40-2-102 (2006). The Defendant argues that there is no proof of the specific offenses alleged in the arrest warrant or for which the magistrate found probable cause. She also argues that there is no proof of any timely charging instrument alleging the offenses charged in this case or of the general sessions court proceedings. The Defendant also argues that even if there is proof she was charged by arrest warrant on April 20, 2006, there is no proof of the number of charges or the identity of those offenses.

The record reflects that Magistrate McGlasson identified his handwriting on the magistrate's log and acknowledged the "8:06" entry contained the Defendant's name and charges of resisting arrest and assault on an officer. He also testified that he spoke with Deputy Wagonshultz in order to determine whether there was probable cause to sign the warrant. Magistrate McGlasson testified that Magistrate Potts spoke with the Defendant and that Magistrate Potts warned the Defendant she could be held in contempt of court. The Defendant also testified about the contempt warning. The evidence of record reflects that the Defendant was charged by arrest warrant with resisting arrest and assault on an officer on April 20, 2006. To the extent that the arrest warrant may have charged offenses that were

the subject of the later indictment and superseding indictment, the prosecution was timely. See id.

We next consider the Defendant's argument that the record does not contain proof from which this court can conclude that the indicted charges correspond to those alleged in the arrest warrant. The Defendant has waived our consideration of the issue by failing to provide this court with an adequate record. As the appellant, the Defendant was required to prepare a record that conveyed a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of the appeal. T.R.A.P. 24(b); State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Without the arrest warrant, we cannot determine whether its charges correspond to the indicted charges. To the extent that the Defendant wished to raise an issue regarding the statute of limitations, she was required to ensure that the relevant documents or evidence were included in the appellate record.

We likewise reject the Defendant's argument that she is entitled to relief because the State failed to present testimony identifying the offenses of which the magistrate found probable cause. We note that Magistrate McGlasson testified that he issued the arrest warrant and that he identified the charges listed in the magistrate's log. Further, the record fails to reflect that the Defendant raised the statute of limitations challenge in the trial court, thereby depriving the State of the opportunity to present relevant proof. See T.R.A.P. 36(a) ("relief may not be granted in contravention of the province of the trier of fact"). We note, as well, there was no requirement that the indictment allege facts to demonstrate that the prosecution began within the statute of limitations. State v. Messamore, 937 S.W.2d 916, 919 (Tenn. 1996).

We recognize that if the warrant and the indictment did not charge the same offenses, the statute of limitations would have had to have been waived knowingly and voluntarily in order for the prosecution to take place and that waiver cannot be presumed from a silent record. See State v. Pearson, 858 S.W.2d 879, 887 (Tenn. 1993). Our treating the issue as waived, however, is not tantamount to presuming that the Defendant knowingly and voluntarily consented to an otherwise untimely prosecution because the appellate record does not contain anything from which this court could conclude that the prosecution was untimely. Rather, the record as it exists supports the State's position that a timely prosecution began with the arrest warrant, that the Defendant was later indicted on the charges alleged in the warrant, and that the State later obtained a superseding indictment. The Defendant is not entitled to relief.

**II**

-17-

The Defendant contends that the evidence is not sufficient to support her resisting arrest conviction. The State counters that the proof was sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Regarding the misdemeanor offense of resisting arrest, Tennessee Code Annotated provides:

> (a) It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at the officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.
>
> (b) Except as provided in § 39-11-611 [the self-defense statute], it is no defense to prosecution under this section that the stop, frisk, halt, arrest or search was unlawful.
>
> (c) It is an offense for a person to intentionally prevent or obstruct an officer of the state or any other person known to be a civil process server in serving, or attempting to serve or execute, any legal writ or process.

T.C.A. § 39-16-602(a) - (c) (2010). "'Force' means compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." T.C.A. § 39-11-106(a)(12) (2006) (amended 2009).

The Defendant argues that the indictment charged only that she prevented, not obstructed, her husband's arrest and that there is not sufficient proof that she prevented his arrest because the officers ultimately were able to arrest Mr. Thompson. She claims that at most, she is guilty of attempted resisting arrest. We note that the Defendant does not claim

that there was a variance between the allegations in the indictment and the trial proof. <u>See, e.g.</u>, <u>State v. Moss</u>, 662 S.W.2d 590, 592 (Tenn. 1984) (holding that when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense"). Rather, her argument is limited to a challenge to the sufficiency of the evidence.

We begin by addressing the Defendant's argument that if she is guilty of any offense, it is attempted resisting arrest. This court has said that attempted resisting arrest is not a crime in Tennessee because the crime itself is "in the nature of an attempt." <u>State v. Adams</u>, 238 S.W.3d 313, 326-27 (Tenn. Crim. App. 2005). As <u>Adams</u> indicates,

> If . . . the statutory definition of the essence of a crime is the attempt to do a certain act, the crime is committed regardless of whether or not the act is performed. . . . So long as the statute defines the crime as consisting in the attempt, the crime is committed if the attempt is made, regardless of whether it is successful and even regardless of whether the objective would be criminal apart from the attempt.

<u>Id.</u> at 327 (quoting <u>People v Schmidt</u>, 352 N.Y.S.2d 399, 402 (N.Y. Crim. Ct. 1974)). Thus, the Defendant is either guilty of resisting arrest or no offense.

We consider next the Defendant's argument that the officers' eventual arrest of Mr. Thompson is fatal to the State's case that the Defendant prevented Mr. Thompson's arrest. In this regard:

> As defined in Black's Law Dictionary, 6th edition, to "obstruct" is to "hinder or prevent from progress." While our definition of resisting arrest does not actually include the word "attempt" within its definition, the crime of resisting arrest is defined in the nature of an attempt, such that an "attempt to resist arrest" would amount to an attempt to commit an attempt. The word "prevent" connotes a completed act such that the crime would be completed at the instant the law enforcement officer was actually "prevented" from effecting the arrest. On the other hand, if a person does not prevent, but obstructs, the crime is also completed. Therefore, it follows that <u>if you attempt to prevent, but fail in doing so, you have obstructed a law enforcement officer from effecting an arrest</u>. Thus, the crime of

-19-

resisting arrest is complete once a defendant has attempted it. See State v. Russell, 10 S.W.3d 270 (Tenn. Crim. App. 1999) (holding that evidence was sufficient to sustain a conviction for resisting arrest where defendant hit the officer who was attempting to arrest defendant's brother even when preventing the arrest was unsuccessful).

Adams, 238 S.W.3d at 327 (emphasis added). The Defendant's failure to attain the goal of preventing her husband's arrest does not exempt her from criminal liability.

We must consider, then, whether there was proof beyond a reasonable doubt that the Defendant used force to resist her husband's arrest. In the light most favorable to the State, the evidence reflects that Deputy Wagonshultz advised the Defendant that he was at her home to arrest her husband. As the deputy walked toward the Defendant's house to make the arrest, the Defendant argued with him and repeatedly stepped in front of him. The deputy said that he tried to step around her but that she continued to block his path to the house. He testified that the Defendant's behavior was threatening. He advised her that she could be arrested if she persisted. When he tried to restrain her, she pulled away. We conclude that the evidence is sufficient to support the resisting arrest conviction. Cf. Russell, 10 S.W.3d at 276 (holding that the evidence was sufficient to support the defendant's conviction of resisting arrest of another person where proof showed that the defendant stood between an officer and the third party and that the defendant lunged forward and slapped the arresting officer's back during the arrest of the third person); State v. Tamba Trinise Leke, No. W2009-02583-CCA-R3-CD, Madison County (Tenn. Crim. App. Oct. 15, 2010) (affirming resisting arrest conviction where "force" occurred as the defendant pulled away from officer's attempts to handcuff her as she was being arrested for disorderly conduct); State v. Mary Margaret Boyd, No. M2004-00580-CCA-R3-CD, Davidson County (Tenn. Crim. App. Apr. 15, 2005) (affirming resisting arrest conviction of defendant who became belligerent, "wallowed all over the ground," and tried to strike officer with her fist as she was being handcuffed); State v. Daniel M. Tidwell, No. 01C01-9807-CC-00288, Williamson County (Tenn. Crim. App. June 30, 1999) (affirming resisting arrest conviction of defendant who flailed his arms and struggled with arresting officers), app. denied (Tenn. Jan. 3, 2000). The Defendant is not entitled to relief.

## III

The Defendant contends that the trial court erred in admitting evidence of her post-arrest conduct at the jail. She argues that the evidence was unfairly prejudicial and should have been excluded under Tennessee Rules of Evidence 403 or 404(b). The State contends that the Defendant waived any objection to admission of the evidence under Rule 404 by

failing to state an objection on that basis in the trial court, that the evidence was relevant to show the Defendant's continuing resistant behavior during the course of the arrest, and that the Defendant has not shown plain error. We conclude that the Defendant is not entitled to relief.

The evidence in question consists of Deputy Wagonshultz's testimony that the Defendant yelled and was disruptive and irrational at the jail. The record reflects that trial counsel objected on the basis that the evidence was not relevant and that the State argued the evidence "would go to an assault or resisting arrest, or her misbehavior throughout the course of the night." The trial court overruled the objection but did not state the basis for its ruling. Defense counsel also objected to hearsay testimony, and although the trial court did not address the objection, the prosecutor rephrased his question to avoid testimony about hearsay.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes).

When relevant evidence reflects on the defendant's character, however, the trial court must apply the more rigorous standard of Tennessee Rule of Evidence 404(b), rather than Rule 403. State v. James, 81 S.W.2d 751, 758 (Tenn. 2002); State v. Dubose, 953 S.W.2d 649, 655 (Tenn. 1997). Rule 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Id.; State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon

request state on the record the material issues, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4). We review a trial court's ruling on evidentiary matters under Rule 404(b) using an abuse of discretion standard, provided the trial court has substantially complied with the procedural prerequisites of the rule. DuBose, 953 S.W.2d at 652.

The State argues that the Defendant waived any objection to Rule 404(b) admission of the testimony by failing to object on this basis at the trial. As a general principle, relief is not available to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). Our supreme court has said that "Failure to raise a contemporaneous objection to . . . testimony as being a prior bad act effectively waives this issue." State v. Thacker, 164 S.W.3d 208, 239 (Tenn. 2005). Likewise, a party may not assert one basis for excluding evidence at the trial and a different basis on appeal. State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). To do so results in waiver. Id. Because the Defendant failed to make a contemporaneous objection to admission of the evidence on any basis other than its relevance, he has waived any complaint about the admission of the evidence, subject to its relevance. See Tenn. R. Evid. 103(a)(1).

Upon review, we conclude that the evidence of the Defendant's conduct at the police station bore some relevance to the allegations of criminal conduct at the scene, given that the Defendant was alleged to have resisted arrest and assaulted an officer while in an agitated state of mind due to prior incidents involving Mr. Duvall and Deputy Wagonshultz. The evidence was probative of the Defendant's hostile demeanor toward law enforcement officials immediately after she was alleged to have resisted arrest and assaulted an officer. The conduct was part of the same course of events involving the Defendant and Deputy Wagonshultz.

The question becomes whether the evidence, though relevant, should have been excluded under Tennessee Rule of Evidence 404(b). As we have noted, the Defendant waived this issue by failing to raise it in the trial court. This court may, however, in the interest of justice, recognize plain error in the record. See T.R.A.P. 36(b). Our supreme

court has adopted five factors to consider when deciding whether an error constitutes plain error in the absence of an objection at trial:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting Adkisson, 899 S.W.2d at 641-42). In order for this court to reverse the judgment of a trial court, the error must be "of such great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642.

Upon review, we conclude that plain error relief is not warranted. We begin by noting that the Defendant's complaint on appeal is that the evidence was unfairly prejudicial because it showed that she committed another crime, contempt of court. As we have stated, the evidence was relevant and admissible to show the Defendant's hostile demeanor toward law enforcement officials immediately after she was alleged to have resisted arrest and assaulted an officer. The focus of the proof was not whether the Defendant was guilty of contempt of court and whether this conduct conformed with a character trait that reflected on her guilt of the present offenses. Rather, the focus was on her anger about Officer Wagonshultz's presence at her home due to the situation with the Duvalls and her resistance to her husband's arrest. Although not mentioned by the Defendant, we note that Deputy Barnes, Ms. Walkers, and Magistrate McGlasson also testified about the Defendant's uncooperative behavior at the jail. The Defendant has not shown that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration of the error is necessary to do substantial justice. We hold that the Defendant is not entitled to plain error relief.

## IV

The Defendant contends that the trial court erred in failing to instruct the jury on self-defense for the resisting arrest charge. The State argues that the Defendant waived any right to a self-defense instruction by failing to request it and that in any event, the evidence did not support the instruction. We hold that the Defendant is not entitled to relief.

The Defendant acknowledges that trial counsel did not request a self-defense instruction at the trial, although she notes that the issue was raised in the motion for a new trial. In criminal cases, regardless of whether a request is made, the trial court has the duty to charge the jury on all of the law that applies to the facts of the case. See State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992) (citing State v. Thompson, 519 S.W. 2d 789, 792 (Tenn. 1975)). The defendant also "has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." Thompson, 519 S.W.2d at 792; see T.C.A. § 39-11-203(c) (2010) (entitling a defendant to have the issue of the existence of a defense submitted to the jury when it is fairly raised by the proof). An erroneous jury instruction may deprive the defendant of the constitutional right to a jury trial. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000).

Likewise, an instruction on a defense must be given if fairly raised by the proof regardless of whether the defense relies on the theory or requests that an instruction be given as to that theory. See State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001); see also State v. Allen, 69 S.W.3d 181, 187-88 (Tenn. 2002); Alfonzo Williams v. State, No. W2008-00106-CCA-R3-PC, Shelby County, slip op. at 6 (Tenn. Crim. App. July 29, 2009) (applying the supreme court's holding in Allen to conclude that an instruction on a defense must be given if fairly raised by the proof), app. denied (Tenn. Mar. 1, 2010). "In determining whether a defense is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." Sims, 45 S.W.3d at 9 (citing Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998)); see also State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). If evidence has been presented which reasonable minds could accept as a defense, "the accused is entitled to the appropriate instructions." Johnson, 531 S.W.2d at 559.

At the time of the Defendant's crime, the self-defense statute provided:

> (a) A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

(b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

(c) The threat or use of force against another is not justified if the person consented to the exact force used or attempted by the other individual.

(d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

(1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

(2) The other nevertheless continues or attempts to use unlawful force against the person.

(e) The threat or use of force against another is not justified to resist a halt at a roadblock, arrest, search, or stop and frisk that the person knows is being made by a law enforcement officer, unless:

(1) The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and

(2) The person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary.

T.C.A. § 39-11-611 (2006) (amended 2007, 2008, 2009).

We begin by noting that the Defendant was charged with resisting her husband's arrest, not her own. Thus, the instruction was required if the proof fairly raised the question of whether Deputy Wagonshultz used or attempted to use excessive force in his arrest of the Defendant's husband and the Defendant reasonably believed that force was required to protect against the use or attempted use of excessive force. Id. § 39-11-611(e)(1) - (2). The Defendant argues that Deputy Wagonshultz's actions when he "was forcibly attempting to subdue the Defendant . . . raised a jury issue as to the deputy's use of excessive force." She notes her own testimony that the deputy grabbed her arm, forced her to the ground, kneeled on top of her, beat her with his fists, and tried to remove her shorts. Even if this evidence is accredited, self-defense was not fairly raised because the Defendant was charged with resisting her husband's arrest, not her own. The proof shows that Deputy Wagonshultz came onto the Defendant's property and attempted to go to the house to arrest Mr. Thompson and that the Defendant attempted to intervene, either verbally, by repeatedly stepping in front of him, or both. Deputy Wagonshultz attempted to arrest the Defendant for resisting her husband's arrest, following which point the alleged excessive force and alleged self-defense took place. At this point, the Defendant was resisting her own arrest. Because the Defendant was not on trial for resisting her own arrest, self-defense did not apply. The trial court did not err in failing to give a self-defense instruction, and the Defendant is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE